J-S01001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: P.T.M. AND K.L.M., MINORS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.H. AND C.N.M., | : | |
| FATHER AND MOTHER | : | |
| | : | No. 1539 MDA 2017 |

Appeal from the Decree Entered September 5, 2017
in the Court of Common Pleas of Lancaster County,
Orphans' Court at No(s): 0287-2017

BEFORE: GANTMAN, P.J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED MARCH 21, 2018**

J.H. ("Father") and C.N.M. ("Mother") appeal from the Decree entered on September 5, 2017, granting the Petition filed by the Lancaster County Children and Youth Social Service Agency ("Agency") to terminate their parental rights to their minor, female child, K.L.M. ("K") (born in April of 2015). Mother additionally challenges the termination of her parental rights her minor, male child, P.T.M. ("P") (born in June of 2009).[1] After careful review, we vacate and remand for additional proceedings in the trial court.

---

[1] P's father is R.F.M., whose paternal rights to P were voluntarily terminated by a Decree entered on June 5, 2017. Trial Court Opinion, 11/2/17, at 1 n.1. R.F.M. has not filed an appeal from the termination of his parental rights, nor is he a party to the instant appeal.

In its Opinion, the trial court summarized the factual and procedural history underlying the instant appeal, which we adopt as though fully restated herein.  *See* Trial Court Opinion, 11/2/17, at 1-14.

On September 5, 2017, the trial court entered its Decree terminating the parental rights of Mother to P, and of Mother and Father to K.  On October 3, 2017, both parents filed a joint, single Notice of appeal from the Decree, along with a Concise Statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[2]

Father and Mother argue that the Agency did not establish, by clear and convincing evidence, the grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and/or (8).  Brief for Appellants at 15-57.  Father and Mother further contend that, even if the Agency established by clear and convincing evidence grounds for termination pursuant to 23 Pa.C.S.A.

---

[2] On April 16, 2013, the Note to Pa.R.A.P. 341 was amended to state that, where one or more orders resolves issues arising on more than one docket or relating to more than one judgment, an appellant must file separate notices of appeal from each order or judgment.  *See* Pa.R.A.P. 341, Note.  In *General Electric Credit Corp. v. Aetna Casualty and Surety Co.*, 263 A.2d 448, 452 (Pa. 1970), the Pennsylvania Supreme Court stated that "taking one appeal from several judgments is not acceptable practice and is discouraged." In *Commonwealth v. C.M.K.*, 932 A.2d 111, 113 (Pa. Super. 2007), this Court quashed a joint notice of appeal filed by co-defendants from separate judgments of sentence, *citing* *General Electric*, *supra* and Pa.R.A.P. 512, Note.  Father and Mother should have filed a separate notice of appeal from the termination Decrees as to each child, and had the appeals entered on separate dockets.  If they had done so, the appeals would have been consolidated for the convenience of the panel and the parties, in any event. *See* Pa.R.A.P. 513.  We, therefore, do not find the appeals defective, and will address them.

§ 2511(a), the Agency did not establish, by clear and convincing evidence, the 23 Pa.C.S.A. § 2511(b) requirement, *i.e.*, that the developmental, physical and emotional needs and welfare of the children would not be harmed by termination of parental rights. Brief for Appellants at 52. Father and Mother assert that the case should be remanded for a proper subsection (b) analysis.

In reviewing an appeal from the termination of parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual

findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 539 Pa. 161, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove, by clear and convincing evidence, that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). "The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Section 2511 provides, in relevant part, as follows:

### § 2511. Grounds for involuntary termination

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has directed that

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-55 (Pa. Super. 2004) (citations omitted).

To satisfy the requirements of subsection 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under subsection 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may

include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

When we review the trial court's analysis of subsection 2511(a)(5), we consider the following:

> Under [subsection] 2511(a)(5), we, thus, review the record to determine whether [a child has] been removed from [the parent] for six months and whether [the parent] can remedy the conditions leading to the removal of [the child]. *See*[] *In the Interest of Lilley*, 719 A.2d 327, 334 (Pa. Super. 1998) (the child has been removed from the parents by the court and the conditions which led to placement of the child continue to exist and have not been remedied within a reasonable time and termination of parental rights would best serve the needs and welfare of the child). We also note that in considering the importance of stability to a child's welfare, the reasons why the child has been with the third party for so long must be taken into account. *In Re: Adoption of Steven S.*, 417 Pa. Super. 247, 612 A.2d 465, 471 (1992), *appeal denied,* 533 Pa. 661, 625 A.2d 1194 (1993).

*In re Adoption of T.B.B.*, 835 A.2d 387, 395 (Pa. Super. 2003).

Further, to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), it must be demonstrated that "(1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d at 1275-76. "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the

- 7 -

trial court must next determine whether the conditions necessitating placement persist, despite the reasonable good faith efforts Agency supplied over a realistic period of time. *Id.* Terminating parental rights under subsection (a)(8) does not require the trial court to evaluate a parent's current "willingness or ability to remedy the conditions that initially caused placement." *T.B.B.*, 835 A.2d at 396 (citation omitted).

In its Opinion, the trial court provided a comprehensive summary and analysis of the evidence supporting termination pursuant to subsections (a)(1), (2), (5), and (8). *See* Trial Court Opinion, 11/2/17, at 2-14, 15-19. Our review discloses that the trial court's decision to terminate the parental rights of Father and Mother under subsections (a)(1), (2), (5), and (8), is supported by competent, clear and convincing evidence in the record, and we discern no abuse of discretion in this regard. We therefore adopt the trial court's Opinion as to termination of Father's and Mother's parental rights pursuant to subsections (a)(1), (2), (5) and (8). *See* Trial Court Opinion, 11/2/17, at 15-19.

Next, we address Father's and Mother's claim that the trial court abused its discretion in terminating their parental rights to their children pursuant to section 2511(b). *See* Brief for Appellants at 50-55. Father and Mother assert that the trial court improperly failed to conduct a separate analysis pursuant to subsection (b), requiring remand to the trial court for a full analysis pursuant to that subsection. *See id.* at 55.

- 8 -

The focus in terminating parental rights under subsection 2511(a) is on the parent, but it is on the child pursuant to subsection 2511(b). **See In re Adoption of C.L.G.**, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated the following:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In **In re E.M.**, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791.

**In re: T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." **In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." **In re K.Z.S.**, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

A child's feelings toward a parent are relevant to the section 2511(b) analysis. Nonetheless, concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent …. Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). "[A] parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

With regard to section 2511(b), the trial court stated the following:

When the Agency has met its burden under [s]ection 2511(a), the [c]ourt must also look to the requirements of [s]ection 2511(b) before terminating any parental rights. "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent

- 10 -

to the giving of notice of the filing of the petition."[FN]  23 Pa.C.S.A. § 2511(b).  Section 2511(b) centers judicial inquiry upon the welfare of the child rather than the fault of the parent.  *In re A.R.*, 837 A.2d [at 565].  "Considering what situation would best serve the child's needs and welfare, the court must examine the status of the bond between the natural parent and the child to consider whether terminating the parent's rights would destroy an existing, necessary and beneficial relationship."  [*T.B.B.*, 835 A.2d at 396].

On appeal, the parents assert that the [c]ourt's Order is not supported by evidence, and not in the best interests of the children.  A review of the record, however, indicates otherwise.

_____

[FN] The parents' Concise Statement asserts that this final sentence of section 2511(b) violates their due process and equal protection rights because the Agency can still use the setbacks and failures, occurring after the Petition is filed, against the parents.  The [c]ourt notes that, in this matter, both the progress and setbacks or failures of these parents occurred before the February 2017 Petition was filed; that the setbacks or failures continued afterwards did not alter the [c]ourt's decision.

Trial Court Opinion, 11/2/17, at 15-16 (footnote in original).

Although the trial court stated that the termination of Father's and Mother's parental rights was in the best interests of the children, it failed to discuss subsection (b) with regard to the evidence of record.  Rather, the trial court focused its analysis of the evidence strictly on subsection (a).  A consideration of both subsections (a) **and (b)** is necessary for the involuntary termination of parental rights.  Therefore, we are constrained to vacate the Decree, and remand the matter to the trial court for a full section 2511(b) analysis.  *See T.S.M.*, *supra*; *In re K.Z.S.*, *supra*.

On remand, the trial court has the discretion to take additional testimony and receive more evidence to complete the section 2511(b) best

interests analysis. Accordingly, although we discern no abuse of the trial court's discretion with regard to 23 Pa.C.S.A. § 2511(a), we vacate the Decree and remand the case for the trial court's consideration and analysis under 23 Pa.C.S.A. § 2511(b). The trial court shall hold further evidentiary proceedings, if necessary, and then enter a new decree.[3]

Decree vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/21/2018

---

[3] Because of our disposition, we do not reach the parents' argument concerning whether the second portion of section (b) is unconstititutional as violative of the guarantee to due process, and the trial court's reasoning for rejecting that argument. **See** Trial Court Opinion, 11/2/17, at 15 n.5, *supra*.

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY PENNSYLVANIA
ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| IN RE: IN THE INTEREST OF | : | Docket No: 287 OF 2017 |
| P.T.M. | : | SUPERIOR CT NO: 1539 MDA 2017 |

| | | |
|---|---|---|
| IN RE: IN THE INTEREST OF | : | Docket No: 288 OF 2017 |
| K.L.M. | : | SUPERIOR CT NO: 1539 MDA 2017 |

BY GORBEY, J.

**OPINION SUR APPEAL**

**Procedural History**

This matter came before this Court on the Petition filed on February 8, 2017 by the Lancaster County Children and Youth Social Service Agency ("Agency") to terminate the parental rights C.N.M.("Mother") and J.H.,("Father") the birth parents of K.L.M. ("K"), born April 14, 2015, and to terminate the parental rights of Mother to P.T.M. ("P"), born June 13, 2009.[1]

This family's contact with the Court in the dependency matter began with the Agency's filing for custody of P and his older sister K.M. (Mother's oldest child, born March 5, 2000), granted by the Court on November 10, 2014.[2]  The Agency filed for

---

[1] P's father is R.F.M., and his paternal rights to P were voluntarily terminated by Decree on June 5, 2017; as such, his rights are not at issue in the matter at hand.

[2] These cases are docketed to CP-36-DP-0280-2014 (P), and CP-36-DP-152-2014 (K).  These cases were incorporated into the instant Orphans' Court matter by Orders dated October 17, 2016, March 13, 2017 and May 1, 2017.  For clarity's sake, we refer to either the OC-docket or the DP-docket, and the date and title of the document cited.

1

custody of K and that request was granted by the Court on April 28, 2015. The Agency then filed an February 8, 2017 Petition to terminate the parental rights of Mother and Father. Hearings were held on May 1, June 5 and September 5, 2017; Mother and Father were present with counsel. On September 5, 2017, a Decree was issued to terminate the parental rights of Mother to P and of both parents to K. On October 3, 2017, both parents appealed that Decree to the Pennsylvania Superior Court.

## Factual History

Mother has four children, including the two at issue herein. The Agency became involved in 2012, with concerns for K.M.'s neglect, truancy and mental health; concerns that Mother was not following up with K.M.'s mental health needs resulted in a January 9, 2013 Family Service Plan ("FSP") to address these concerns, as well as concerns with income and housing stability and parenting skills. *DP-docket 11/7/2014 Petition, OC-docket 5/1/2017 N.T. at 20.* A report in August of 2013 raised concerns with ongoing sexual abuse of K.M. by P's father, R.F.M.; he was subsequently indicated as the perpetrator of sexual abuse and pled guilty to related charges in March of 2014. *DP-docket 11/7/2014 Petition, OC-docket 5/1/2017 N.T. at 20, 21.* Since 2013, there have been ongoing concerns with Mother neglecting K.M.'s mental health and abuse recovery needs and P's needs for speech therapy, concerns with truancy for both K.M. and P, and ongoing unstable income and housing. *DP-docket 11/7/2014 Petition, OC-docket 5/1/2017 N.T. at 20.* The Court approved a child permanency plan (CPP) and Mother had reunification goals including work on mental health, parenting skills, financial and housing stability, demonstrating commitment to her children, and

2

understanding sexual victimization. *DP-docket 12/8/2014 Ex. 1, OC-docket 5/1/2017 N.T. at 21.* P was placed in a resource home in December of 2014. *DP-docket 11/15/2014 Order.*

K was born on April 14, 2015 and the Agency petitioned for custody of K, noting that Mother's other children were in Agency care and that her progress on her CPP goals was minimal; Mother had taken no steps towards her mental health goals, and not attended any classes regarding sexual victimization, and was not employed. *DP-docket 3/31/2015 Petition, 4/16/2015 Petition, OC-docket 5/1/2017 N.T. at 21.* Additionally, Mother was not sure who K's father was, and as such, the Agency could not identify any paternal kinship resources. *DP-docket 4/16/2015 Petition.* The Court approved a CPP for Mother which matched the CPP already in place regarding P. *DP-docket 6/15/2015 Ex. 1, OC-docket 5/1/2017 N.T. at 21.* K was placed with her brother P in a resource home in April of 2015. *DP-docket 4/27/2015 Order.*

A permanency review hearing was held in September of 2015. *DP-docket 8/7/2015 Petition.* By this time, Father had been confirmed as the biological father of K. *DP-docket 8/7/2015 Petition, 9/3/2015 Order, OC-docket 5/1/2017 N.T. at 41 .* The Court approved a CPP and Father had reunification goals including cooperating with the Agency, work on mental health, parenting skills, financial and housing stability, and demonstrating commitment to K. *DP-docket 9/2/2015 Ex. 1, 9/3/2015 Order, OC-docket 5/1/2017 N.T. at 41.* Both parents' compliance was moderate and progress minimal. *DP-docket 8/7/2015 Petition, 9/3/2015 Order.* Regarding their mental health goals, Mother had received an evaluation and recommendations, but had not followed

3

through yet, due to insurance issues, and Father had been referred and scheduled for an evaluation. *DP-docket 8/7/2015 Petition, OC-docket 5/1/2017 N.T. at 22.* Regarding parenting skills, Mother had not yet been referred for such classes from her mental health provider. *DP-docket 8/7/2015 Petition, OC-docket 5/1/2017 N.T. at 24.* Regarding financial stability, Mother was working part-time but was looking for other, more consistent employment and Father continued to work at just-less-than-full-time hours; both parents were reminded to submit pay stubs. *DP-docket 8/7/2015 Petition.* Regarding housing, the parents were looking for suitable housing to accommodate both K and P. *DP-docket 8/7/2015 Petition.* Regarding their commitment to the children, the parents were visiting regularly with both children, as they intended to parent the children together.[3] *DP-docket 8/7/2015 Petition, DP-docket 5/1/2017 N.T. at 61-62.* Regarding her sexual victimization education goal, Mother was attending and participating. *DP-docket 8/7/2015 Petition.*

A permanency review hearing was held in February of 2016. *DP-docket 1/21/2016 Petition.* Both parents' compliance was substantial and progress moderate; Mother's progress was a compelling reason for the Agency to not pursue termination of parental rights at that time. *DP-docket 1/21/2016 Petitions, 2/16/2016 Orders.* Regarding their mental health goals, Mother was attending counseling regularly and making progress, and after some miscommunication about his provider selection, Father had been referred for counseling. *DP-docket 1/21/2016 Petitions, OC-docket*

---

[3]The parents' Concise Statement alleges error by the Court in failing to evaluate Father's parenting separately from that of Mother; however, because the parents were steadfast in their commitment to parent together, including having another child and marrying during the pendency of this matter, their parenting abilities must be evaluated together because they both contribute to the family's welfare.

4

*5/1/2017 N.T. at 22-23, 41.* Regarding parenting skills, Mother completed a parenting capacity evaluation and was referred to work with a Personalized Parent Trainer (PPT) and Father had not yet been referred by his mental health provider. *DP-docket 1/21/2016 Petitions, OC-docket 5/1/2017 N.T. at 23, 24.* Mother had also been referred to a pain management clinic. *DP-docket 1/21/2016 Petitions, OC-docket 5/1/2017 N.T. at 23.* Regarding financial stability, Mother was working full-time but far from home and was looking for employment closer to home, and Father had started new full-time employment; both parents were reminded to submit pay stubs. *DP-docket 1/21/2016 Petitions.* Regarding housing, the parents had moved into a three-bedroom home with room for the parents, K, P and K.M; both parents were reminded to submit utility payment documentation. *DP-docket 1/21/2016 Petitions.* Regarding their commitment to the children, the parents were visiting regularly with both children, as well as K.M., as they intended to parent the children together, although Father's work schedule sometimes required him to miss the group visits and to meet separately with his daughter K. *DP-docket 1/21/2016 Petitions.* Regarding her sexual victimization education goal, Mother had successfully completed her goal. *DP-docket 1/21/2016 Petition.* At this time, P had been in placement for 15 months and K for nine months. *DP-docket 1/21/2016 Petitions.*

A permanency review hearing was held in July of 2016. *DP-docket 6/21/2016 Petitions, 7/25/2016 Orders.* Both parents' compliance and progress were moderate. *DP-docket 6/21/2016 Petitions, 7/25/2016 Orders.* Regarding their mental health goals, Mother was attending counseling regularly and making progress and Father had

5

successfully completed counseling. *DP-docket 6/21/2016 Petitions, OC-docket 5/1/2017 N.T. at 23, 42.* Mother had not met with anyone at the pain management clinic. *DP-docket 6/21/2016 Petitions, OC-docket 5/1/2017 N.T. at 23.* Regarding parenting skills, Mother and Father began work with the PPT, although the PPT had trouble meeting with Father due to his work schedule. *DP-docket 6/21/2016 Petitions, OC-docket 5/1/2017 N.T. at 23, 24, OC-docket 9/1/2017 at 17.* The PPT expressed concerns with Mother's ability to manage three children at the same time, as Mother spent time talking with K.M. but was not ensuring the safety of K. *DP-docket 6/21/2016 Petitions, PPT Court Report 5/2/2016, OC-docket 5/1/2017 N.T. at 24, 33, OC-docket 9/1/2017 N.T. at 71.* Mother struggled to interact with P, instead offering him her phone for video games. *OC-docket 5/1/2017 N.T. at 36, 70-71.* Specifically, visits between Mother and the three children indicated that Mother left K in a safety seat alone on the sofa, Mother was pushing K in a swing with her back to the other children, Mother showed flowers to K while P was walking towards traffic, and Mother took K.M. to the bathroom while leaving the younger two children alone and out of sight in a pizza shop booth. *DP-docket PPT Court Report 5/2/2016.* The PPT did not recommend that the Agency begin transition-home visits at that time. *DP-docket 6/21/2016 Petitions.*

Regarding financial stability, Mother was working full-time closer to home, but her income, alone, was insufficient to provide for all three children; Father's income was sufficient to cover the family's basic needs. *DP-docket 6/21/2016 Petitions.* Regarding housing, the parents had moved into a three-bedroom home with room for the parents, K, P and K.M; the parents appeared to be struggling with utility payments. *DP-docket*

6

*6/21/2016 Petitions.* Regarding their commitment to the children, Mother visited regularly with the children, although P spent much of the time playing with Mother's telephone, and Father's visits with K had been less consistent due to a shift change. *DP-docket 6/21/2016 Petitions, PPT Court Reports 7/25/2016, OC-docket 5/1/2017 N.T. at 70-71.* Mother had missed a meeting regarding the children with the COBYS Agency. *DP-docket CASA Reports 4/20/2016, OC-docket 5/1/2017 N.T. at 76.* At this time, P had been in placement for 20 months and K for 15 months. *DP-docket 6/21/2016 Petitions, 7/25/2016 Orders.*

A permanency review hearing was held in December of 2016. *DP-docket 11/7/2016 Petitions, 12/12/2016 Orders.* Both parents' compliance and progress were substantial. *DP-docket 11/7/2016 Petition, 12/12/2016 Order.* The Agency had not moved forward with a Petition to Terminate Parental Rights, at this time, because of the progress made by the parents. *DP-docket 12/12/2016 Orders.* Regarding their mental health goals, Mother was attending counseling regularly and making progress and Father had successfully completed counseling. *DP-docket 11/7/2016 Petitions, OC-docket 5/1/2017 N.T. at 23, 42.* Mother had still not met with anyone at the pain management clinic. *DP-docket 11/7/2016 Petitions, OC-docket 5/1/2017 N.T. at 23.* Regarding parenting skills, Mother and Father had begun work with the PPT, but attendance had been inconsistent. *DP-docket 11/7/2016 Petitions, DP-docket 6/5/2017 N.T. at 91-92, 97.* The PPT expressed concerns with the home's sanitation and clutter in light of young children; in-home visits were set to begin soon. *DP-docket 11/7/2016 Petitions, OC-docket 5/1/2017 N.T. at 24-25, 28-31, 68-69, OC-docket 9/1/2017 at 20,*

7

*32-34.* In November of 2016, Mother had admitted to needing more visits to allow her to adjust, before P and K were returned to her care. *DP-docket CASA Reports 11/27/2016.*

Regarding financial stability, Mother was working full-time but her income, alone, was insufficient to provide for all three children; Father's income was sufficient to cover the family's basic needs. *DP-docket 11/7/2016 Petitions.* Regarding housing, the parents had moved into a three-bedroom home with room for the parents, K, P and K.M; the parents continued to struggle with utility payments. *DP-docket 11/7/2016 Petitions.* Regarding their commitment to the children, Mother visited regularly the children, and Father's visits with K had been less consistent due to a shift change. *DP-docket 11/7/2016 Petitions.* The parents had been instructed, in anticipation of the children being returned to their care, to enroll P in school and K in daycare, but those steps were never fully completed. *OC-docket 5/1/2017 N.T. at 37-38, 57-59, DP-docket 6/5/2017 N.T. at 55-59.* Transition visits, which began in December 2016, had been halted by February of 2017, out of concerns for the parents' ability to keep the children safe and to provide for their well-being. *DP-docket 11/7/2016 Petitions, DP-docket 6/5/2017 N.T. at 89-90, 93-96, OC-docket 9/1/2017 N.T. at 58, 60.* After a weekend visit in January of 2017, P told his resource mother that he had not eaten that day until Mother finished work and returned home at 2:30pm; Mother later informed the PPT that the family was low on food because a car accident limited her ability to work and earn money. *DP-docket 4/11/2017 Petitions, OC-docket 5/1/2017 N.T. at 33-34, DP-docket 6/5/2017 N.T. at 66-68, OC-docket 9/1/2017 N.T. at 34-35.* Father's CPP had been

8

amended to include a goal regarding sexual victimization education, because Mother's oldest child K.M. had been victimized by P's father; Father had begun classes and progress was needed. *DP-docket 11/7/2016 Petition.* At this time, P had been in placement for 25 months and K for 20 months. *DP-docket 11/7/2016 Petitions, 12/12/2016 Orders.*

On February 8, 2017, the Agency filed a Petition to Terminate the Parental Rights of Mother and Father, pursuant to 23 Pa. C.S. §2511(a)(1), (2), (5) and (8).[4]

Permanency review and termination of parental rights hearings were held in May, June and September of 2017. *DP-docket 4/11/2017 Petitions, 5/2/2017 Orders, 8/8/2017 Orders, 6/5/2017 Orders.* Regarding D, Mother's progress was minimal. *DP-docket 4/11/2017 Petition, 6/5/2017 Order.* Regarding K, Mother's progress was moderate, and Father's was minimal. *DP-docket 4/11/2017 Petition, 6/5/2017 Order.* Neither parent had completed the goals on their CPPs. *OC-docket Ex. 2 5/1/2017, OC-docket 5/1/2017 N.T. at 22.* Regarding her mental health goals, Mother had lost her medical assistance for a period of time, and as such, had not received or taken her medications; by the time of the hearing, Mother reapplied and refilled her prescriptions; Mother continued with therapy and medication compliance. *DP-docket 4/11/2017 Petitions, 8/8/2017 Petitions, OC-docket 5/1/2017 N.T. at 23, 78, DP-docket 6/5/2017 N.T. at 13-14.*

---

[4] The Agency had previously filed a similar petition on August 3, 2016, docketed as OC-1690-2016 and 1691-2016. That Petition was withdrawn in December of 2016 because the parents were making substantial progress on their CPPs at that time. *OC-docket 5/1/2017 N.T. at 18-19.*

Regarding parenting skills, the PPT expressed concerns with clutter and cleanliness, with Mother's time management, supervision of the children, ability to interact one-on-one with the children, and lack of structure or discipline that left P's acting-out unchecked. *DP-docket 4/11/2017 Petitions, 6/5/2017 Orders, OC-docket 5/1/2017 N.T. at 24-25, 32-33, 40, DP-docket 6/5/2017 N.T. at 14-15, 17, 26-27, 46-47, 68-71.* An August 4, 2017 visit noted three medication bottles on the high chair and coffee table, nail polish and remover, cigarettes and empty drink cans within reach of the children, and a cat urine and/or mold smell at D's bed. *DP-docket 8/8/2017 Petitions, OC-docket 5/1/2017 N.T. at 28-31, OC-docket 9/1/2017 N.T. at 50-553.* At another visit, K was allowed to chew on a glow stick. *DP-docket 6/5/2017 N.T. at 17, 35-36.* The PPT observed that Mother appeared overwhelmed and was not using the skills learned through the PPT work. *DP-docket 4/11/2017 Petitions, 6/5/2017 Orders, DP-docket 6/5/2017 N.T. at 16-17, OC-docket 9/1/2017 N.T. at 23, 25-26, 29-32, 64-66.* This was a concern because the parents worked opposite schedules and were regularly alone in care of the children. *DP-docket 5/1/2017 N.T. at 44, DP-docket 6/5/2017 N.T. at 20-21.* Mother told the PPT trainer that she did not believe there was any more benefit to gain by working with the PPT; Father agreed. *DP-docket 4/11/2017 Petitions, 6/5/2017 Orders, OC-docket 5/1/2017 N.T. at 24-25, 42, 45, OC-docket 9/1/2017 at 20-21.* PPT services were suspended thereafter. *DP-docket 6/5/2017 N.T. at 14.*

Regarding financial stability, Mother was working full-time but her income, alone, was insufficient to provide for all three children; Father's income was sufficient to cover the family's basic needs. *DP-docket 4/11/2017 Petitions, OC-docket 5/1/2017 N.T. at*

10

26. Regarding housing, the parents continued to struggle with utility payments. *DP-docket 4/11/2017 Petitions, OC-docket 5/1/2017 N.T. at 28.* Cleanliness was a concern, including cat feces and vomit, scissors, cigarettes and medication being in reach of the children. *DP-docket 4/11/2017 Petitions, 6/5/2017 Orders, OC-docket 5/1/2017 N.T. at 28, 79-80, DP-docket 6/5/2017 N.T. at 64-65, OC-docket 9/1/2017 N.T. at 74-75.* Regarding their commitment to the children, Mother visited regularly with the children but was often late, and Father's visits with K had been less consistent due to a shift change. *DP-docket 4/11/2017 Petitions, DP-docket CASA Reports 4/27/2017, OC-docket 5/1/2017 N.T. at 31-32, DP-docket 6/5/2017 N.T. at 15.* Mother missed an early-intervention appointment for K, despite notice that it was scheduled around her work schedule. *DP-docket 6/5/2017 Order, 5/1/2017 N.T. at 39-40, 76-77, DP-docket 6/5/2017 N.T. at 27-28, OC-docket 9/1/2017 N.T. at 28.* Mother also did not attend P's therapy sessions, despite knowing that it would be helpful for P's development. *OC-docket 5/1/2017 N.T. at 38-39, 77.* The in-home visits had been relocated to a supervising agency in February of 2017, and the weekend visits were terminated, because of concerns for safety in the home. *DP-docket 4/11/2017 Petitions, OC-docket 5/1/2017 N.T. at 30-3, 65-66.*

Father had completed the sexual victimization education classwork, but concerns remained that he would not apply the knowledge acquired, and the therapist suggested that, if K.M. were to return to the home, home-based supports should be put in place to make sure Father complied with the safety plan and supported the children. *DP-docket 4/11/2017 Petition, OC-docket 5/1/2017 N.T. at 46, DP-docket 6/5/2017 N.T. at 23-24.*

11

In June, 2017, the Agency recommended a goal change to adoption for both children; P had been in placement for 30 months and K for 25 months. *DP-docket 4/11/2017 Petitions, 6/5/2017 Orders, DP-docket 6/5/2017 N.T. at 31.*

At the conclusion of the testimony on September 1, 2017, the Court issued an Order terminating Mother's parental rights to P and both parents' rights to K, pursuant to 23 Pa. C.S. §2511(a)(1), (2), (5) and (8). *OC-docket 9/5/2017 Decree.* The Court found clear and convincing evidence of the parents' failure to perform parental duties for more than twelve months, that the parents' continued incapacity caused the children to be without essential parental care, that the parents cannot remedy the causes within a reasonable period of time, and that termination of the parents' rights would best serve the children. *OC-docket 9/5/2017 Decree.* At that time, P had been in placement for 31 months and K for 26 months. *DP-docket 8/8/2017 Petitions, 9/1/2017 Orders.*

The Court notes that a Court-Appointed Special Advocate ("CASA") has been involved in with the family since January 2016, and that the CASA has filed numerous reports for each of the children at issue over her years of involvement. The CASA has continually noted that the resource parents are loving and kind with the children, and that the children are emotionally attached to the resource parents. *DP-docket CASA Reports 4/20/2016, 7/17/2016, 11/27/2016, OC-docket 5/1/2017 N.T. at 48-49, DP-docket 6/5/2017 N.T. at 88.* P's COBYS caseworker also noted his "significant" bond with the resource parents and that he thrived in their care. *OC-docket 5/1/2017 N.T. at 13-14.* By this time, P referred to his resource mother as "mom" and has expressed a desire to be adopted by the resource parents; K calls her resource mother "Momma." *DP-docket CASA Report*

12

*4/27/2017, OC-docket 5/1/2017 N.T. at 9, 10, 49, DP-docket 6/5/2017 N.T. at 30, OC-docket 9/1/2017 at 8, 14-15, 17.* In July of 2016, the CASA observed minimal affection between Mother and P, and no affection from K towards Mother or Father. *DP-docket CASA Reports 7/17/2016.*

In November of 2016, the CASA reported that P's behavior changed, including being clingy to the resource parents, having trouble sleeping, and being more tearful when asking questions about "where he will live." *DP-docket CASA Report 11/27/2016.* P was playing sports and learning piano, and both children enjoy the company of the resource family's extended family and the various animals at the resource home. *DP-docket CASA Reports 4/27/2017.* P's behavior, during the weekend visits to Mother's home, became erratic, including anger, hurting other children, sleep disruptions, frustration, and again, concerns about where he would live; P was happy when he learned that there would be no more weekend visits. *DP-docket CASA Report 4/27/2017, OC-docket 5/1/2017 N.T. at 35-36, 79, DP-docket 6/5/2017 N.T. at 28-30, OC-docket 9/1/2017 N.T. at 8-9, 10-11.*

The resource parents had raised concerns regarding K's speech delay. *DP-docket CASA Report 11/27/2016, DP-docket 6/5/2017 N.T. at 12.* In April of 2017, the resource parents were helping K with communication by teaching her some sign language, and following up on recommended speech and orthopedic evaluations. *DP-docket CASA Report 4/27/2017, DP-docket 6/5/2017 N.T. at 33.* K was also toilet-trained with few accidents. *DP-docket CASA Report 4/27/2017.* K, also, was showing behavioral changes that coincided with the weekend visits, including being clingy to her resource parents and sleep disturbances, as well as potty-training and sign language regression. *DP-docket*

13

*CASA Report 4/27/2017, OC-docket 5/1/2017 N.T. at 49, DP-docket 6/5/2017 N.T. at 32-33, OC-docket 9/1/2017 at 9.*

The CASA is in agreement with the Agency, that termination of the parents' parental rights will serve the best interests of the children. *DP-docket 6/5/2017 N.T. at 78, 87-88.*

## ISSUE

Whether a termination of parental rights is appropriate when the children have been in placement for almost three years during which time the parents have not completed their child permanency plans, and where credited testimony indicates that the best interests of the children will be served by terminating the parents' parental rights?

## ANALYSIS

Parental rights may be terminated by statute; the pertinent statute, 23 Pa. C.S. §2511(a), provides for termination of those rights when:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> ...
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
> ...

14

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

"In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." *In re Adoption of M.R.B.*, 25 A.3d 1247, 1251 (Pa. Super. 2011). "The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *M.R.B.*, supra, at 1251.

When the Agency has met its burden under Section 2511(a), the Court must also look to the requirements of Section 2511(b) before terminating any parental rights. "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."[5] 23 Pa.C.S. §2511(b). Section 2511(b) centers judicial inquiry upon the welfare of the child rather than the fault of the parent. *In re A.R.*, 837 A.2d 560 (Pa. Super.

---

[5]The parents' Concise Statement asserts that this final sentence of section 2511(b) violates their due process and equal protection rights because the Agency can still use the setbacks and failures, occurring after the Petition is filed, against the parents. The Court notes that, in this matter, both the progress and setbacks or failures of these parents occurred before the February 2017 Petition was filed; that the setbacks or failures continued afterwards did not alter the Court's decision.

15

2003). "Considering what situation would best serve the child's needs and welfare, the court must examine the status of the bond between the natural parent and the child to consider whether terminating the parent's rights would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa. Super. 2003).

On appeal, the parents assert that the Court's Order is not supported by evidence, and not in the best interests of the children. A review of the record, however, indicates otherwise.

### TIMING

The language of 23 Pa.C.S. §2511(a), sections 1, 5 and 8 requires the Court to examine the facts in the context of time, specifically: the six-month period before the filing of the Petition to Terminate Parental Rights (a)(1); the child's legal status over six months (a)(5); and the child's status over 12-months after placement (a)(8).

At the time of this writing, the children have been in placement for 35 and 30 months, including 26 months between P's dependency determination and the February 2017 Petition to Terminate Parental Rights, and 21 months between K's dependency determination and the February 2017 Petition to Terminate, and for both, and in the twelve-months after their respective dependency determinations. In the six months from August 2016 to February 2017, the parents struggled to manage three children, to attend appointments for their children, and to keep the home free of clutter and safety hazards, even with PPT visits scheduled and predictable.

This Court is concerned that forcing the children to remain in the uncertainty of placement, after almost three years already in placement, while continuing to wait for their

16

parents to change, will be harmful to them. The timing requirements of 23 Pa.C.S. §2511(a), sections 1, 5 and 8, have been met.

## PARENTAL EFFORTS

The language of 23 Pa.C.S. §2511(a), sections 1, 2, 5 and 8 requires the Court to examine the parents' conduct, specifically; the parents' refusal or failure to perform parental duties (a)(1); the parents' incapacity, abuse, neglect or refusal to care for her children and whether the underlying causes can or will be remedied (a)(2); the causes of the children's placement and whether the parents can remedy the causes with the assistance of services (a)(5); and the causes of placement and whether the causes continue (a)(8). "The focus of the termination proceeding is on the conduct of the parent and whether his conduct justifies termination of parental rights." *In re B.,N.M.*, 856 A.2d 847, 854–55 (Pa. Super. 2004).

As this Court has noted, the parents' efforts have ranged from minimal to substantial. Even with a PPT in the home, in the six months from August 2016 to February 2017, the parents struggled to manage three children, and to keep the home free of clutter and safety hazards; as soon as the children started their transition visits in December of 2016, even more serious concerns developed. In nearly three years, the parents had not completed parenting training and their commitment goals were at issue, with numerous attendance issues including missing appointments scheduled for the children. These issues were consistent and repeated, throughout the Agency's involvement, and were not remedied despite the Agency's involvement.

Parental duty is "best understood in relation to needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met

17

by a merely passive interest in development of the child. ... [T]he parental obligation is a positive duty which requires affirmative performance.". *In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000). *In re G.P-R*, 851 A.2d 967 (Pa. Super. 2004). . "Where the child is in foster care, this affirmative duty requires the parent to work towards the return of the child by cooperating with the Agency to obtain the rehabilitative services necessary for him to be capable of performing his parental duties and responsibilities." *In re G.P.R.*, 851 A.2d 967, 977 (Pa. Super. 2004), *summarizing In re: William L.*, 383 A.2d 1228, 1233-34 (Pa. 1978).

Here, the parents' continued inability to care for their children or to complete permanency plans for reunification supports the termination decision in the Orphans' Court. This Court cannot gamble with the safety and welfare of these children. The parents have had ample opportunities to demonstrate their ability to be acceptable parents but have failed to do so. The parental efforts requirements of 23 Pa.C.S. §2511(a), sections 1, 2, 5 and 8, have been met.

### BEST INTERESTS OF THE CHILDREN

The language of 23 Pa.C.S. §2511(a), sections 5 and 8 requires the Court to examine whether termination of the parents' rights would best serve the needs and welfare of the children.

The Court does not see a bond between the parents and these children sufficient to interfere with the termination of the parental rights. The credited testimony of the CASA is particularly enlightening; the CASA noted the children's ease with the resource parents, and that the children sought those parents for comfort. In contrast, the children's visits with Mother and Father brought developmental regression and behavioral problems.

18

These children deserve the certainty of remaining with parents they love and are bonded to, and do not deserve the parents who are unwilling to care for them in a healthy and appropriate manner; the best interest requirements of 23 Pa.C.S. §2511(a), sections 5 and 8, have been met.

By clear and convincing evidence, the Agency has met its burden to terminate the parents' parental rights under Sections 2511(a)(1), (a)(2), (a)(5) and (a)(8).

## CONCLUSION

For the reasons stated above, the Court concludes that it is appropriate to terminate Mother's parental rights to P and Mother and Father's rights to K. The Clerk of the Orphans' Court is directed to transmit the record, *with incorporated dockets*, to the Superior Court.

BY THE COURT:

LESLIE GORBEY, JUDGE

DATED: NOV. 2, 2017

Attest:

Copies to:
Elizabeth Stineman, Esquire, Guardian *ad Litem*
Gary G. Efstration, Esquire, for parents
Laura McGarry, Esquire/Courtney J. Restemayer, Esquire, for CYA

19